

CERTIFIED COPY

A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 09-2764

IYARE EGONMWAN,

*Plaintiff-Appellant,*

*v.*

COOK COUNTY SHERIFF'S DEPARTMENT, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-04764—**Amy J. St. Eve,** *Judge.*

---

ARGUED FEBRUARY 25, 2010—DECIDED APRIL 22, 2010

---

Before CUDAHY, EVANS, and SYKES, *Circuit Judges*.

EVANS, *Circuit Judge*. Iyare Egonmwan was charged with custodial sexual misconduct while employed as a correctional officer in the Cook County jail's women's division and subsequently terminated.[1] After being ac-

---

[1] Today, we also decide the case of *Swearnigen-El v. Cook County Sheriff's Department*, No. 09-2709, which arises from the same

(continued...)

quitted of the charges, Egonmwan brought this lawsuit
against the Cook County Sheriff's Department, which
operates the Cook County Department of Corrections
(CCDOC) and Sheriff's Police (CCSP); the County of Cook;
the sheriff, Michael Sheahan; two CCDOC directors,
Callie Baird and Scott Kurtovich; the superintendent of
the women's division, Katie Harrison; the chief of the
CCDOC's Internal Affairs Division (IAD), Timothy
Kaufmann, deceased; and an IAD investigator, Miriam
Rentas. Egonmwan alleges that the defendants initiated a
frivolous criminal prosecution and ultimately terminated
him because of his gender, race, and protected speech.
The defendants, on the other hand, contend that they
terminated Egonmwan because of his sexual misconduct
and were uninvolved with his criminal proceedings. The
district judge sided with the defendants, granting their
motion for summary judgment, *see Egonmwan v. Cook
County Sheriff's Dep't*, No. 06 C 4764, 2009 WL 1139150
(N.D. Ill. Apr. 27, 2009), and denying Egonmwan's sub-
sequent motion for reconsideration. Egonmwan now
appeals.

---

[1] (...continued)
investigation of custodial sexual misconduct in the women's
division. Like Egonmwan, Swearnigen was charged but ac-
quitted after a bench trial, by the same state court judge. He
then brought a lawsuit, by the same counsel, against the
defendants, alleging gender and race discrimination (among
other things), which was dismissed on summary judgment.
*See Swearnigen-El v. Cook County Sheriff's Dep't*, No. 05 C 1493,
2009 WL 1849809 (N.D. Ill. June 26, 2009).

At this stage in the proceedings we must construe all facts and reasonable inferences in favor of Egonmwan.[2] As so viewed, the facts are that CCDOC General Order 4.1 provides that "serious misconduct," such as disregarding federal, state, or local laws or engaging in conduct unbecoming to an employee, is grounds for disciplinary action. General Order 3.8 forbids employees from engaging in "sexual conduct or sexual relationships, physical in nature, with a person in the custody and care of the CCDOC" and further states that a detainee is incapable of consent. Illinois law similarly provides that a penal system employee commits the offense of custodial sexual misconduct by "engag[ing] in sexual conduct or sexual penetration with a person who is in the custody of that penal system" and that an inmate is incapable of consent. *See* 720 ILCS 5/11-9.2.

Egonmwan, an African-American[3] male, began working as a correctional officer at the jail in 1999 and transferred to the women's division in the summer of 2001. On September 1, 2002, Harrison de-deputized Egonmwan for violating the jail's ethics and standard of conduct re-

_____

[2] The defendants criticize the statement of facts section of Egonmwan's appellate brief for containing inaccurate citations. We were able to locate the vast majority of Egonmwan's citations and therefore we decline the defendants' request to impose sanctions.

[3] Egonmwan refers to his race as "African-American" so we will do the same. Swearnigen, in the companion case, refers to himself as "Black" so in his case we will do the same.

No. 09-2764

garding an incident that occurred in April 2001—that is, before his transfer to the women's division. On September 11, 2002, Egonmwan filed an internal sexual harassment complaint against Harrison, claiming that she used sexual innuendos and pressured him for dates. The IAD investigated the claim and deemed it unfounded. A week later, Harrison told Egonmwan, while referring to a terminated employee, "There's someone else that will be getting out of here real soon." A week after that, Egonmwan was suspended for 10 days without pay, again regarding the April 2001 incident. (He never served the sentence, however, because he was still grieving it when he was arrested in August 2003.)

In January 2003,[4] Harrison told Kenneth Swearnigen-El, another African-American correctional officer in the women's division, that she wanted to remove all the men from the women's division. In February 2003, Egonmwan received a performance evaluation indicating that he was meeting standards overall but needed improvement on "promptness/absences." In March or April 2003, Nicole Burns, a female detainee, gave Harrison a letter alleging that male correctional officers were engaging in sexual intercourse with her and other detainees in the

---

[4] Egonmwan now argues, without citing to the record, that this conversation took place "[s]ometime after May 2003 but before July 3, 2003." The defendants, on the other hand, point to three places in the record where Swearnigen admitted that the conversation took place in January 2003. It therefore would be unreasonable to accept Egonmwan's contention as to when the conversation occurred.

women's division. The letter did not name any individual officers. Harrison met with Burns to discuss the letter and made a report, which stated that Burns named officers Robert Buchanan and Fred McBride, both African-American, as culprits. In her deposition several years later, Harrison initially testified inaccurately that Burns named Egonmwan.

Harrison sent the letter to Kurtovich and Kaufmann, who then forwarded the allegations to the CCSP. Detectives from the CCSP conducted interviews of numerous female detainees. Approximately 20 male officers, about half of them African-American, were "suspects of interest," including Buchanan and McBride. The detectives reported their findings to the Cook County State's Attorney.

In June 2003, two assistant state's attorneys (ASAs) began interviewing detainees. They did not interview the defendants. Harrison and Rentas attended some of the detainees' interviews and purportedly questioned them, but the defendants otherwise were not involved. During the investigation, detainee Aurora Acuna told the ASAs that she and her cell mate, Portia Warrington, had a sexual encounter with Egonmwan. Warrington was interviewed and confirmed Acuna's story. Acuna also said that Egonmwan agreed to pay her for sexual favors and deliver the money to her brother. The ASAs met with Aurora's brother, Gonzalo. He told them that, on two occasions, Egonmwan drove to his house to deliver money for Acuna.

On July 30, 2003, the IAD de-deputized Egonmwan. On August 13, 2003, the CCSP arrested him. That same day,

the ASAs approved felony charges for custodial sexual misconduct against Egonmwan. Swearnigen and another African-American officer, James Anthony, were also charged. The ASAs testified that they did not consult with the defendants on their decisions and that those three officers were charged due to consistent witnesses and corroborative evidence. Three days later, Egonmwan was suspended with pay pending a hearing pursuant to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), as only the merit board could terminate his employment. *See* 55 ILCS 5/3-7012. One Caucasian officer, Paul Usyak, was also de-deputized and suspended with pay pending a *Loudermill* hearing for living with a former inmate. (Usyak was not, however, criminally charged.) The women's division was subsequently converted into a unit monitored almost exclusively by female officers. The female-only policy was deemed a bona fide occupational qualification. Male officers in that division were transferred, not terminated.

On August 22, 2003, the hearing board sustained the charges against Egonmwan, suspending him without pay pending merit board action. Sheahan then filed a merit board complaint seeking Egonmwan's removal for violating general orders. The merit board hearing, which initially began in July 2004, was postponed until December 2004 to enable Egonmwan to obtain legal representation. At that time, Egonmwan was denied an additional continuance and left the hearing, foregoing his option to proceed *pro se*. Warrington and Acuna testified at the hearing regarding their sexual contact with Egonmwan. Acuna's brother testified about re-

ceiving money from Egonmwan. And a jail administrator authenticated Egonmwan's records, which confirmed that he was assigned to Warrington's and Acuna's tier on the day of their alleged sexual encounter. No defendant testified. In January 2005, the board issued its order, finding by a preponderance of evidence that Egonmwan violated General Orders 3.8 and 4.1 and terminating his employment effective August 25, 2003. Egonmwan did not appeal the decision.

Egonmwan's criminal proceedings also moved forward. In September 2003, a grand jury indicted Egonmwan. A bench trial ensued. Again, neither the defendants nor Egonmwan testified. Warrington and the Acuna siblings, however, did testify consistent with their earlier statements. The ASAs agreed to recommend reductions in the two detainees' sentences in exchange for their testimony. Despite this evidence, Egonmwan was acquitted in August 2004.[5]

After the trial, Egonmwan filed a four-count complaint alleging (1) race discrimination under 42 U.S.C. § 1981; (2) gender and race discrimination under 42 U.S.C. § 1983; (3) retaliation under 42 U.S.C. § 1981; and (4) First Amendment retaliation under 42 U.S.C. § 1983. In June 2008, a few weeks before the close of discovery, Egonmwan mailed a copy of the declaration of a female detainee,

---

[5] The state trial judge found no corroboration for the detainees' testimony, which he discounted because they had "motivations to lie." He also found Gonzalo Acuna's testimony incredible.

No. 09-2764

Latoya Williams, to the defendants. (Williams was inter-
viewed by the CCSP investigators but not the ASAs.) In
the declaration, Williams claimed that investigators
pressured her to falsely implicate Egonmwan, which
Williams refused to do. Williams also stated that Acuna
and Warrington told her that investigators told them to
lie about having sex with officers. After receiving the
declaration, the defendants scheduled Williams's deposi-
tion, but she failed to appear. The defendants then filed
a motion for a rule to show cause. The district judge
denied the motion but barred Egonmwan from using
Williams's declaration.

After the defendants moved for summary judgment,
Egonmwan dropped his § 1981 retaliation claim. Three
months later, Williams was deposed in the related
*Swearnigen* case. The district court subsequently granted
the defendants' motion for summary judgment on all of
Egonmwan's remaining claims. Egonmwan moved to
reconsider the judgment and also to supplement his
response with Williams's deposition. The district judge
denied the motion, finding that "Rule 59(e) is not a vehicle
for Egonmwan's counsel to undue her own failures,
namely, her failure to take and defend a timely deposi-
tion of Williams, especially because counsel had
contact with Williams from at least June 2008."

We review the grant of summary judgment *de novo*.[6]
*Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir.

---

[6] Egonmwan expressly waives his right to appeal the district
court's grant of summary judgment on his First Amendment
retaliation claim.

2009). Summary judgment is appropriate where the admissible evidence shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (internal quotation marks omitted).

To avoid summary judgment on his gender and race discrimination claims, Egonmwan must either point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the "direct" method) or establish a prima facie case under the *McDonnell Douglas* formula (the "indirect" method).[7] *Paz v. Wauconda Healthcare & Rehab. Ctr.*, 464 F.3d 659, 665 (7th Cir. 2006). A prima facie case under the indirect method requires Egonmwan to prove that (1) he is a member of a protected class; (2) his job performance met the CCDOC's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual outside his protected class was treated more favorably. *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 750-51 (7th Cir. 2006). After making this showing, if the defendants counter with legitimate, nondis-

---

[7] The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403-04 (7th Cir. 2007); *Davis v. Wis. Dep't of Corrections*, 445 F.3d 971, 976 (7th Cir. 2006).

criminatory reasons for their actions, Egonmwan would also have show that those reasons were pretextual. *Id.* at 751.

Egonmwan purports to establish gender discrimination via the direct method. To this end, he points to (1) Harrison's September 2002 statement to Egonmwan, while referring to a terminated employee, that "[t]here's someone else that will be getting out of here real soon"; (2) Harrison's January 2003 statement to Swearnigen that she wanted to remove all men from the women's division; and (3) the August 2003 policy change permitting only female officers to monitor the women's division. Although stray remarks are generally insufficient to establish discriminatory motivation, an exception may be made where the remark was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007).

Egonmwan argues that Harrison should be considered the decisionmaker because she "exercised a significant degree of influence over the contested decision," *see Sun v. Bd. of Trustees*, 473 F.3d 799, 813 (7th Cir. 2007), even though it was the merit board that terminated his employment and the ASAs who brought criminal charges against him. Specifically, Egonmwan claims that Harrison initiated the investigation against him, which was the "fruit of the poisonous tree" that led to his criminal prosecution and termination. But the only admissible evidence offered to support this contention is Harrison's

deposition testimony, in which she initially testified (inaccurately) that Burns named Egonmwan. This is not enough to create a reasonable inference that Harrison brought Egonmwan's name into the investigation. Furthermore, how the investigation was triggered is not the point. Rather, the point is that, *after* the investigation was triggered, evidence of misconduct was uncovered by the CCSP investigators and the ASAs, the ASAs independently decided to bring charges, and various witnesses testified about Egonmwan's wrongdoing in front of the merit board and a grand jury—all without any input from Harrison or the other defendants.

Even if Harrison could be considered the decision-maker, the time lapse between her two statements and the July and August actions against Egonmwan is too long to support an inference of discrimination. *See, e.g., Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 722 (7th Cir. 2008) (collecting cases and finding a gap of three months insufficient to create a reasonable inference of discrimination). Nor did her remarks specifically refer to Egonmwan's termination. And, as for the August 2003 policy change, it did not affect Egonmwan because it was implemented only after his arrest and on the heels of an investigation into custodial sexual misconduct by male officers. Moreover, male officers in the women's division were transferred to other divisions, not terminated. Summary judgment was proper on Egonmwan's gender discrimination claim.

Egonmwan attempts to show race discrimination via both methods of proof. Under the direct method, he

points to circumstantial evidence, arguing that similarly situated non-African-American officers were treated more favorably and that the defendants' proffered reasons for taking action against him were pretextual. Because these are also required elements of his case under the indirect method, our analyses overlap. *See Hemsworth*, 476 F.3d at 490-91 (explaining that the indirect method "involves a subset of circumstantial evidence (including the disparate treatment of similarly situated employees) that conforms to the prescription of [*McDonnell Douglas*]"); *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 601 (7th Cir. 2003) (explaining that the "pretext" category of circumstantial evidence under the direct method is substantially the same as the evidence required under the indirect method).

The evidence shows that about 20 officers of various races were "suspects of interest" during the investigation, including many African-American officers—such as McBride and Buchanan, the two officers originally named by Burns—who were *not* administratively charged by the defendants. If the defendants had racial animus, we would have expected them to take action against more than three of the African-American suspects. Egonmwan contends, however, that one similarly situated Caucasian officer, Usyak, was treated more favorably. But the defendants took action against Usyak: like Egonmwan, he was de-deputized and suspended with pay pending a *Loudermill* hearing. Usyak, however, quit before the merit board could decide whether to terminate his employment. The fact that Usyak was not criminally charged is irrelevant because that decision was made by the ASAs.

Furthermore, Usyak is not similarly situated because there were no allegations that he was having sexual relations with a *current* detainee. Rather, he was suspended because he was living with a *former* jail detainee.

Meanwhile, the defendants offer legitimate, nondiscriminatory reasons for their actions: (1) Burns's letter stated that officers in Egonmwan's division were having sex with detainees; (2) Warrington and Acuna said that they had a sexual encounter with Egonmwan; (3) Acuna said that Egonmwan agreed to deliver money to her brother money for sexual favors; (4) Acuna's brother said that he received money from Egonmwan; and (5) a jail administrator confirmed that Egonmwan was assigned to Warrington's and Acuna's tier on the day of their alleged sexual encounter. After hearing this testimony, the merit board found by a preponderance of evidence that Egonmwan violated general orders. Egonmwan argues that he was prevented from disputing these allegations but glosses over his failure to appear at the merit board hearing or appeal its decision. He also cites a good performance evaluation, but it was issued prior to the investigation into his alleged sexual misconduct. And the fact that Egonmwan was acquitted of the criminal charges does not demonstrate pretext because the state had a higher burden of proof at trial than was required before the merit board. *See Faas*, 532 F.3d at 642 ("Pretext means a dishonest explanation, a lie rather than an oddity or an error.") (internal quotation marks omitted). Because Egonmwan has not shown discriminatory motivation under the direct method or carried his burden under the indirect method, summary judgment was proper on his race discrimination claim.

Finally, we turn to the district court's denial of Egonmwan's motion for reconsideration, which asked the court to consider Williams's deposition testimony. We review this decision for an abuse of discretion. *Andrews v. E.I. Du Pont De Nemours & Co.*, 447 F.3d 510, 515 (7th Cir. 2006). Rule 59(e) allows a court to amend a judgment "only if the petitioner can demonstrate a manifest error of law or present newly discovered evidence." *Obriecht v. Raemisch*, 517 F.3d 489, 494 (7th Cir. 2008). The district court correctly granted summary judgment for the defendants, so there was no manifest error of law. As for new evidence, motions under Rule 59(e) cannot be used to introduce evidence that could have been presented earlier. *Id.* Here, the district court found that Egonmwan's counsel was in contact with Williams before the close of discovery and failed to offer any valid reason why she did not produce Williams for a deposition at that time. There is no evidence that the district court abused its discretion in denying Egonmwan's motion.[8]

In sum, there is no evidence that, as Egonmwan contends, the defendants "perpetuated and fed a hysteria

---

[8] Even if it had been admitted, Williams's testimony would not have affected the outcome. Williams claimed that, contrary to the information in the CCSP report, she never told investigators that she saw officers having sex with inmates. But there is no indication that her allegedly fabricated statements were used to charge or terminate Egonmwan. And Williams's testimony regarding statements made by Warrington and Acuna about investigators offering them deals to falsely implicate officers is hearsay.

No. 09-2764                                                    15

among the inmates, which rivals that of only Abigail Williams and her Salem pack, for their own nefarious purposes." Rather, Egonmwan—one of many suspects in a wide-ranging investigation of custodial sexual misconduct—was terminated and prosecuted because of corroborated evidence of wrongdoing. As a result, his claims cannot move forward. The judgments of the district court are AFFIRMED.